## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

GENUSWAVE LIMITED AND STEVEN
ALEVY,

                Plaintiffs,

      v.

ASHER BAUM, MITCHELL BOGART, AND
ISRAEL NISSENBAUM,

                Defendants.

:
:
:
:
:
:
:
:
:
:
:
:

**CIVIL ACTION NO.** 1:24-cv-5466 _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs GenusWave Limited ("GenusWave") and Steven Alevy ("Alevy") (collectively, "Plaintiffs"), by and through their attorneys, file this Complaint against Defendants Asher Baum ("Baum"), Mitchell Bogart ("Bogart"), and Israel Nissenbaum ("Nissenbaum") (collectively, "Defendants," and together with Plaintiffs, the "Parties"), and allege as follows:

## NATURE OF THE ACTION

1.    Plaintiff GenusWave is a corporation that, as relevant here, develops technology to save lives and protect the planet. Plaintiff Alevy is the Director of GenusWave.

2.    Defendant Nissenbaum served as Plaintiffs' attorney since at least 2012 until November 2021.

3.    In May 2020, Nissenbaum approached Plaintiffs with an opportunity to invest in an ultraviolet C ("UVC") light-based technology for medical applications, originally intended for the treatment of COVID-19 (the "UVC Technology").

4.    Less than one month later, in June 2020, Nissenbaum facilitated an initial meeting between Plaintiffs and Defendants to discuss development of the UVC Technology.

5.      On information and belief: Defendant Baum is the Co-Founder and Managing Partner of AptusTech, a technology company; worked at Shift Studios, a branding and marketing design firm; and is affiliated with a foreign light manufacturer, Spark Lighting. Baum has known Nissenbaum and Bogart since at least 2019, and is listed as their co-inventor and/or co-applicant on several United States patents and patent applications. Baum served as GenusWave's Project Manager for the UVC Technology during the course of the events alleged in this Complaint, and was being considered to take the role of Chief Operations Officer of any future GenusWave subsidiary created for the UVC Technology.

6.      On information and belief, Defendant Bogart is the Chief Executive Officer and Manager of Rampage LLC, which develops, maintains, and defends intellectual property in the digital press sector. He has known Baum and Nissenbaum since at least 2019, and is listed as their co-inventor and/or co-applicant on several United States patents and patent applications. Bogart served as the Chief Technology Officer ("CTO") of GenusWave during the course of the events alleged in this Complaint, until the deterioration of Plaintiffs' relationships with Defendants.

7.      From the Parties' initial meeting in June 2020 through July 2021, the Parties worked collaboratively to advance the UVC Technology, including developing trade secrets and filing provisional patent applications, assessing whether the UVC Technology could be used for purposes other than the treatment of COVID-19, and building product prototypes.

8.      In June 2020, in exchange for future GenusWave funding, Nissenbaum and Plaintiffs entered into an oral contract granting GenusWave a 70% interest in the intellectual property, including trade secrets, know-how, and competitively-sensitive information, related to the UVC Technology, and in any entity formed for its development and commercialization (the "Contract").

9.      Confident that Nissenbaum would uphold his contractual obligations, and relying on Defendants' repeated assurances of GenusWave's majority ownership interest, GenusWave upheld its contractual funding obligations. Between June 2020 and July 2021, GenusWave provided over sixty thousand dollars to develop the UVC Technology, contributed large amounts of its own time and resources, and arranged for GenusWave's existing outside engineering experts' assistance, each of which was used to improve the UVC Technology.

10.     On July 22, 2021, Nissenbaum pressured Plaintiffs to accept a reduction in GenusWave's ownership interest in order to accommodate a controlling interest for a strategic investor. Plaintiffs rejected Nissenbaum's request to modify the Contract. Plaintiffs, however, expressed a willingness to discuss alternative modifications, if all parties agreed it was necessary, to continue developing the UVC Technology with the same collegiality and cooperation that Plaintiffs believed had underpinned the Parties' efforts to that point.

11.     But unbeknownst to Plaintiffs, Defendants had, on information and belief, already conspired to deprive GenusWave of any claim to the UVC Technology, while also siphoning off GenusWave's funds, exploiting Plaintiffs' labor and contributions, incorporating technical features contributed by Plaintiffs' technology advisors, and ultimately absconding with the UVC Technology and product prototypes.

12.     Plaintiffs spent thousands of dollars and contributed hundreds of hours to develop the UVC Technology. In return, instead of honoring their contractual obligations, upholding their fiduciary duties, and adhering to basic notions of fairness in business dealings, Defendants fraudulently obtained significant, inequitable, illegal, and unearned benefits at Plaintiffs' expense. As set forth below, to compensate for this harm and to prevent further harm, Plaintiffs seek injunctive relief, compensatory and punitive damages, and attorneys' fees and costs.

## PARTIES

13.     Plaintiff GenusWave is a limited company organized under the laws of Scotland, with a principal place of business at 58 Morrison Street, Edinburgh, Scotland EH3 8BP, United Kingdom.

14.     Plaintiff Alevy is the Director of GenusWave, and resides in Long Beach, California.

15.     Defendant Baum served as GenusWave's Product Manager for the UVC Technology during the course of the Parties' UVC Technology collaboration, and was being considered for the role of Chief Operations Officer of a future GenusWave subsidiary devoted to the UVC Technology. On information and belief, he resides in Brooklyn, New York.

16.     Defendant Bogart served as CTO of GenusWave during the course of the Parties' UVC Technology collaboration, and, on information and belief, resides in New Haven, Connecticut.

17.     Defendant Nissenbaum served as Plaintiffs' attorney before and during the course of the Parties' UVC Technology collaboration, and, on information and belief, resides in Brooklyn, New York.

## JURISDICTION AND VENUE

18.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Plaintiffs assert that Defendants have violated the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.* ("DTSA"), a federal law establishing a civil cause of action for the misappropriation of trade secrets. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over state claims Plaintiffs assert against Defendants stemming from the same conduct giving rise to Plaintiffs' DTSA claim.

19.     Venue is also proper pursuant to 28 U.S.C. § 1332 because GenusWave is organized under the laws of Scotland and maintains a principal place of business there, Alevy resides in California, on information and belief Baum and Nissenbaum reside in New York, and on information and belief Bogart resides in Connecticut; on information and belief Baum and Nissenbaum reside within the Eastern District of New York; on information and belief, a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred at Baum's and Nissenbaum's residences in Brooklyn, from which they worked to develop the UVC Technology; and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## FACTUAL ALLEGATIONS

### I.   Nissenbaum's Contract with Plaintiffs

20.     In 2012, Alevy engaged Nissenbaum as his personal attorney on intellectual property matters, and Nissenbaum served in this capacity until November 1, 2021. During the course of this representation, Nissenbaum served as Alevy's patent prosecution counsel for certain domestic and foreign patent applications, and provided legal advice relating to other domestic and foreign patent applications. During this same time, Nissenbaum also served as patent prosecution counsel for patent applications relating to the UVC Technology that Plaintiffs and Defendants were developing.

21.     In May 2020, Nissenbaum approached Plaintiffs with an opportunity to invest in the UVC Technology.

22.     Nissenbaum initially proposed that he would have a 40% ownership interest in the UVC Technology, while GenusWave would have a 60% interest. GenusWave countered by seeking a larger 80% interest. Following negotiations, Nissenbaum and Plaintiffs entered into the Contract on or around June 17, 2020, with the following terms:

a.     GenusWave would invest in the UVC Technology;

b. GenusWave would retain a 70% interest in intellectual property, including trade secrets, know-how, and competitively-sensitive information, developed to advance the UVC Technology and in any entity formed for its development and commercialization;

c. Nissenbaum would retain a 30% interest in such intellectual property and entity; and

d. any ownership interest granted to Baum and/or Bogart would be allocated from Nissenbaum's ownership share.

23. After Nissenbaum and Plaintiffs entered into the Contract on or around June 17, 2020, Nissenbaum served as counsel for GenusWave on matters relating to the UVC Technology.

24. Plaintiffs performed their obligations under the Contract. Between June 2020 and July 2021, GenusWave contributed over sixty thousand dollars to the UVC Technology. This sum includes at least $48,239.64 transferred directly to Nissenbaum, and $12,884.00 transferred directly to Shift Studios and Spark Lighting, which were later discovered to be affiliated with Baum. Plaintiffs also paid for other expenses in connection with the development of the UVC Technology.

25. On information and belief, Baum concealed his relationships with Shift Studios and Spark Lighting, and the resulting benefits he derived from engaging them as GenusWave vendors.

26. On information and belief, Spark Lighting retains copies of its customers' confidential information in the form of product templates.

27. Nissenbaum acknowledged his intent to be bound to the material terms of his Contract with Plaintiffs throughout the course of his work alongside them in developing the UVC Technology.

28.     For example, on April 9, 2021, Nissenbaum emailed Alevy, copying Baum and Bogart, acknowledging that GenusWave had intellectual property rights in the UVC Technology, and assuring Plaintiffs by stating, "Your investment is safe."

29.     Between June 2020 and July 2021, Nissenbaum regularly provided Plaintiffs with legal services. He provided legal advice relating to patents and intellectual property; drafted, revised, and signed nondisclosure agreements with third parties on behalf of GenusWave; and drafted patent applications relating to the UVC Technology. Nissenbaum himself, as well as the other Defendants, acknowledged both orally and in writing that Nissenbaum was GenusWave's counsel.

30.     In his role as GenusWave's counsel, Nissenbaum also advised the Parties to obtain nondisclosure agreements prior to disclosing any of GenusWave's confidential and proprietary information relating to the UVC Technology. Subsequently, Nissenbaum drafted non-disclosure agreements in the name of GenusWave, which included signature blocks that he signed as legal counsel for GenusWave. And on June 28, 2021, Nissenbaum emailed Alevy stating he would "include our ownership of developments or ideas" when drafting nondisclosure agreements with third parties. Baum and Bogart were copied on this email.

31.     Such nondisclosure agreements were critical to protect GenusWave's trade secrets related to the UVC Technology, which included the use of a total internal reflection ("TIR") lens to collimate UVC light prior to its transmission through a fiber optic cable. The nondisclosure agreements were also necessary to protect the trade secrets that GenusWave developed relating to manufacturing plans, processes, and supply chains, which were essential to evaluating and implementing GenusWave's potential commercialization strategies.

32.     GenusWave relied on Nissenbaum as its counsel to ensure that its trade secrets were protected.

33.     In addition to reimbursing Nissenbaum for UVC Technology-related expenditures throughout the course of the Parties' collaboration, on June 29, 2021, GenusWave advanced Nissenbaum thirty-six thousand dollars for UVC Technology-related expenditures.

34.     On July 22, 2021, at an in-person meeting less than one month after GenusWave advanced him thirty-six thousand dollars, Nissenbaum asked Plaintiffs to accept a reduction in GenusWave's ownership interest in order to accommodate a controlling interest for a strategic investor. Plaintiffs rejected Nissenbaum's request to modify their Contract.

35.     During the July 22, 2021 in-person meeting, Nissenbaum, who was still Plaintiffs' attorney, specifically discussed the Contract establishing GenusWave's 70% ownership of the UVC Technology.

36.     Thereafter, Plaintiffs continued to operate as if the Contract was still in place. For example,

> a.     on July 23, 2021, Alevy emailed Defendants to discuss marketing and branding for the UVC Technology;
>
> b.     on July 26, 2021, Alevy emailed Defendants asking about the status of a weekly Zoom meeting to discuss the UVC Technology; and
>
> c.     on July 26, 2021, Alevy emailed Nissenbaum about Plaintiffs' willingness to discuss an alternative Contract modification in order to continue advancing the UVC Technology towards commercialization.

37. Defendants never responded directly to Alevy's emails, which were sent in the days following Alevy's July 22, 2021 meeting with Nissenbaum during which Plaintiffs declined to relinquish part of GenusWave's ownership interest. Instead, Defendants began communicating with Plaintiffs through attorneys.

38. On August 5, 2021, Nissenbaum repudiated his contract with Plaintiffs. On that day, Plaintiffs received a letter from Nissenbaum's attorney, Max Moskowitz ("Moskowitz"), denying that Nissenbaum had ever entered into the Contract with Plaintiffs.

39. Moskowitz's August 5, 2021 letter mischaracterized GenusWave's ownership interest as pertaining exclusively to UVC Technology-related patents, rather than intellectual property more broadly, such as trade secrets, know-how, and competitively-sensitive information; misclassified GenusWave's investment as "interim loans"; and offered Plaintiffs the "opportunity to invest" in the UVC Technology in the future.

40. Nissenbaum ultimately withdrew from his representation of Plaintiffs on November 1, 2021.

## II. The UVC Venture

### A. Defendants Lack the Funding and Technical Expertise to Develop and Commercialize the UVC Technology

41. On April 29, 2020—shortly before Nissenbaum approached Plaintiffs with an opportunity to invest in the UVC Technology—Nissenbaum filed US Provisional Patent Application No. 63/017,407 (the "'407 Provisional"), attached as Exhibit A. The '407 Provisional is entitled "*IN VIVO* UV TREATMENT FOR VIRAL, BACTERIAL AND CANCEROUS PATHOGENS," and lists Defendants and Donald J. Trump as inventors. *See* Ex. A at 4–5, 12, 14.

42. The '407 Provisional broadly contemplates a device that utilizes ultraviolet ("UV") light for the *in vivo* treatment of viral, bacterial, and cancerous pathogens, and methods of

treatment using such a device. *See generally id.* To achieve this, the applicants propose "to utilize existing medical equipment with relatively simple modifications to enable the safe use of UV emissions." *Id.* at 15. For example, the '407 Provisional contemplates that such a device might "comprise[] an endoscope and particularly a bronchoscope, such as those commonly available from the Olympus Corporation, with a fiber optic light source" that could deliver calibrated doses of UV light to internal body surfaces, such as the lungs. *Id*.

43.     However, on information and belief, Defendants lacked the technical expertise and funding to develop and commercialize a device that embodied the UVC Technology. This led Nissenbaum to seek Plaintiffs' funding and expertise in exchange for an ownership stake in the UVC Technology and related ventures—*i.e.*, to enter into the Contract.

**B.  The Parties Solidify Their Roles in the UVC Technology Venture**

44.     On June 10, 2020—less than one month after approaching Plaintiffs about investing in the UVC Technology—Nissenbaum facilitated an initial meeting among Plaintiffs and Defendants.

45.     On information and belief, the Parties were all aligned on the purpose of the meeting: to further develop the UVC Technology with Plaintiffs' involvement so that it would be suitable for clinical development and commercialization.

46.     Prior to the June 10, 2020 meeting, Defendants provided Plaintiffs with an initial unbranded overview of a "new UV therapy program" that contemplated possible parameters and uses for a device that was far from finalized.

47.     Following the June 10, 2020 meeting, and continuing throughout the course of the Parties' collaboration, Plaintiffs participated in confidential internal and external meetings with Defendants relating to the UVC Technology. Through these meetings, the Parties leveraged

Alevy's longstanding relationships with commercial partners and technical experts, whose contributions were crucial for developing a device that embodied the UVC Technology.

48.     Bogart participated in the collaboration as the CTO of GenusWave, a position he held from November 2020 until the deterioration of his relationship with Plaintiffs.

49.     Baum also participated in the collaboration as GenusWave's Product Manager for the UVC Technology, a position he held from about November 2020 until the deterioration of his relationship with Plaintiffs.

50.     Nissenbaum served as counsel for Plaintiffs before and during the UVC Technology collaboration.

### C. Plaintiffs Leverage Sanmina's Technical Expertise

51.     Plaintiffs' contribution to the UVC Technology project included arranging for expert technical assistance from the Sanmina Corporation ("Sanmina"). Sanmina designs and manufactures some of the most complex and innovative optical, electronic, and mechanical products in the world. Recognized as a technology leader, Sanmina provides end-to-end design, manufacturing, and logistics solutions to customers in the industrial, medical, defense and aerospace, automotive, communications networks, and cloud solutions sectors.

52.     Alevy arranged for a meeting on August 24, 2020 with Sanmina to discuss the UVC Technology project. Defendants attended this meeting, as did a number of Sanmina technical specialists, including David Tizzard ("Tizzard"), a senior product design engineer at Sanmina Corporation who worked with Plaintiffs on past and current projects.

53.     Sanmina had previously entered into a nondisclosure agreement with GenusWave, which governed their ongoing relationship. The nondisclosure agreement states that information exchanged under the agreement is owned by the disclosing party and must be kept confidential.

54.     At the August 24, 2020 meeting, the Parties and Sanmina employees discussed the UVC Technology project and the technical requirements for a working device that embodied the UVC Technology.

55.     Among these technical requirements was the need to incorporate optical features that could properly collimate the UVC light so that it could be delivered through an endoscopy tube with sufficient power to provide for the *in vivo* treatment of viral, bacterial, and cancerous pathogens.

56.     On or about September 6, 2020, Sanmina circulated a Customer Requirements List outlining Sanmina's involvement in the design and manufacture of the UVC Technology. The Customer Requirements List is marked "Confidential," and lists "Genuswave" as the customer.

**D.  Nissenbaum Files Additional Provisional Patent Applications Directed to the UVC Technology**

57.     Having secured Plaintiffs' funding and technical assistance with the development of the UVC Technology, Nissenbaum continued to file provisional patent applications that disclosed new features developed during the Parties' collaboration.

58.     For example, early on during the course of the Parties' collaboration, Alevy conceived of using the UVC Technology for the sanitization of endoscopes and other medical devices, as well as for the sanitization of air circulation (HVAC) systems, and he communicated these ideas to Defendants. These applications, identified by Plaintiffs, leverage the germicidal properties of the UVC Technology to effectively eliminate bacteria, viruses, and other pathogens from medical devices and HVAC systems.

59.     On November 18, 2020, Nissenbaum filed US Provisional Patent Application No. 63/115,484 (the "'484 Provisional"), attached as Exhibit B. The '484 Provisional is entitled "UV-C DISINFECTION OF AIR CIRCULATION SYSTEMS," and discloses "disinfection of

circulating air in buildings and enclosed areas particularly with HVAC, air conditioning systems and fan circulation and with use of continuous UV-C treatment of the circulating air." Ex. B at 13.

60.     Recognizing Alevy's contribution to the disclosure of the '484 Provisional, Nissenbaum listed Alevy—along with Baum, Bogart, and Nissenbaum himself—as inventors of the '484 Provisional. *See id*. 3–4, 11.

61.     However, Nissenbaum failed to list the appropriate inventors on other patent applications relating to the UVC Technology.

62.     For example, Alevy and Tizzard worked together to develop the idea to use TIR lenses to collimate the UVC light prior to its introduction into the fiber optic tube of an endoscope. As noted above, proper collimation was a key problem that needed to be solved before a working embodiment of the UVC Technology could be completed.

63.     On February 10, 2021, Tizzard circulated an email to the Parties, attaching a Sanmina-branded presentation dated February 10, 2021 that was prepared exclusively for GenusWave, attached as Exhibit C. This presentation covers a number of technical details relating to the UVC Technology project, and specifically describes the benefits of using a TIR lens to collimate the UVC light, which included control of beam angles, uniform light spread, increases in energy density and irradiance, and flexibility in design. *See* Ex. C at 10.

64.     Shortly thereafter, on February 15, 2021, Nissenbaum filed US Provisional Patent Application No. 63/149,611 (the "'611 Provisional"), attached as Exhibit D. The '611 Provisional was entitled "MAXIMIZATION OF TRANSMITTED LIGHT INTENSITY," and discloses

> maximizing the intensity of transmission of light from a widespread angle light source such as an LED through a transmitting media, such as a fiber optics cable, to an illumination target and in particular the maximizing of the intensity of transmission of deep UV (UV-C to UV-B range) light with minimized attenuation and with maximized transmittable UV light.

Ex. D at 14.

65.     The "Summary" section of the '611 Provisional describes "an efficient light transmitting device and method of light transmission for purposes of focused light applications and for practical UV disinfection in difficult to reach areas such as within a body or within narrow channels such as in endoscopes," and a method of using such a device comprising:

> a) emitting light from a widely scattering non-coherent light source such as an LED;
>
> b) <u>collimating the emitted light to a diameter effective to capture and collimate substantially all of the non-coherent light emitted by the light source</u>;
>
> c) introducing the substantially all of the <u>collimated light</u> into a low attenuation light transmitting medium of a diameter at least substantially equal to that of the collimated light (it is understood that the collimation need not be complete but may be sufficient to introduce light at less than an angular uptake angle);
>
> d) focusing the <u>collimated</u> light to a focal point into a smaller diameter transmitting medium of desired size; and
>
> e) emitting light from the smaller diameter transmitting medium with <u>enhanced power and intensity</u>.

*Id*. at 15–16 (emphasis added).

66.     The '611 Provisional further discloses that the necessary collimation could be achieved

> with a lens system such as a TIR (total illumination retention) lens which is configured to both collimate light collected from a light source such as an LED and to thereafter focus the collimated light to a focal area or plane equal to or less than that of an optical fiber diameter.

*Id*. at 20.

67.     However, while the '611 Provisional discloses the use of a TIR lens to collimate UV light, as proposed by Alevy and Tizzard, Nissenbaum did not list either Alevy or Tizzard as

inventors of the '611 Provisional. *See id*. at 3–4, 11. Instead, the named inventors are Baum, Bogart, and Nissenbaum himself. *See id*.

68.     On April 29, 2021, Nissenbaum filed US Patent Application No. 17/244,860, entitled "REMOTE PATHOGEN ERADICATION" (the "'860 Application"), attached as Exhibit E. This application published on November 4, 2021 under publication number US2021/0338854 A1. *See* Ex. E at 1. The '860 Application lists Defendants as inventors. *See id*.

69.     As filed, the '860 Application claims priority to six provisional patent applications. *See id*. The first of these priority applications is the '407 Provisional that, as alleged above, Nissenbaum had filed prior to Plaintiffs' involvement with the UVC Technology project. *See id*.

70.     The '860 Application also claims priority to the '484 Provisional that disclosed the use of UVC light for the disinfection of HVAC systems (and listed Alevy as an inventor), and the '611 Provisional that disclosed the use of TIR lenses to collimate UVC light (which was proposed by Alevy and Tizzard, although neither was listed as an inventor of the '611 Provisional). *Id*.

71.     However, while the '860 Application initially claimed priority to the '484 Provisional that lists Alevy as an inventor, Nissenbaum did not list Alevy as an inventor of the '860 Application. *See id*. And while the '860 Application also discloses the use of TIR lenses to collimate UV light, *see id*. at 8–9, 45, 51–54, 59, as proposed by Alevy and Tizzard, Nissenbaum again did not list either Alevy or Tizzard as inventors of the '860 Application, *see id*. at 1.

72.     Notably, aside from a brief disclosure of "a method and device for sanitization or disinfection of air and water by transmission of UV light therethrough such as in swimming pools or enclosed vehicles," *see id*. at 39, the '860 Application does not describe or claim the use of UV light for the disinfection of HVAC systems, *see generally id*. And in fact, on September 25, 2022,

Nissenbaum submitted a corrected Application Data Sheet that removed the claim of priority to the '484 Provisional that lists Alevy as an inventor.

73.     On information and belief, Nissenbaum's refusal to list Alevy and Tizzard as inventors of the '611 Provisional and '860 Application that disclosed the use of TIR lenses for the collimation of UVC light, and subsequent removal of the priority claim to the '484 Provisional that listed Alevy as an inventor, was purposefully done to ensure that Plaintiffs would have no ownership interest in any patents that ultimately issued from the '860 Application.

74.     On January 17, 2023, the '860 Application issued as US Patent No. 11,554,187, with Defendants named as inventors of record.

### E. Defendants Acknowledge the Existence of the Contract and the Confidential Nature of the UVC Technology

75.     Defendants, through their conduct, recognized the existence of the Contract.

76.     During the course of the Parties' collaboration, Defendants regularly requested, and were granted, reimbursement from GenusWave for expenses relating to the development of the UVC Technology.

77.     Through July 15, 2021, Defendants repeatedly acknowledged GenusWave's ownership interest in the UVC Technology. For example,

    a.     between November 2020 and March 2021, Bogart, in his position as CTO, authored several GenusWave-branded product overviews and datasheets; and

    b.     on January 31, 2021, Baum sent an email to Alevy, Bogart, and Nissenbaum, setting forth the various aspects of GenusWave intellectual property, including UVC Technology-based products for use in medical treatments, disinfection, and HVAC systems.

These features are reflected in various patent applications filed by Nissenbaum, yet despite Plaintiffs' contributions to the UVC Technology project, only the HVAC-related application listed GenusWave's principal, Alevy, as an inventor, and none of the applications were ever assigned to GenusWave.

78.     In fact, on January 14, 2021, Bogart emailed Alevy, Baum, and Nissenbaum that "following a successful product launch, GenusWave will be the sole manufacturer and distributor of its products, and the determiner of which subcontractors supply which key components."

79.     Defendants also consulted Alevy for critical business discussions related to the UVC Technology, such as a July 4, 2021 email from Baum to Alevy, Bogart, and Nissenbaum discussing objectives through September 2021, with the goal of launching "a disinfection product by March–May 2022."

80.     During this time period, third parties engaged by GenusWave to work on the UVC Technology identified GenusWave as their customer in proposals, invoices, and presentations that were circulated amongst the Defendants, and made significant contributions to the invention on behalf of Plaintiffs.

81.     Throughout the course of developing the UVC Technology, Baum was primarily responsible for communicating with third-party vendors, including ensuring that they executed nondisclosure agreements with GenusWave prior to being provided access to GenusWave's confidential information relating to the UVC Technology. As counsel for GenusWave, Nissenbaum advised Baum to obtain nondisclosure agreements with all third parties.

82.     While Baum did secure nondisclosure agreements with some third parties, on information and belief, and unbeknownst to Plaintiffs, he failed to secure nondisclosure

agreements with third parties with whom he had longstanding business relationships, including Shift Studios, Spark Lighting, and at least one other potential investor.

83.     On information and belief, Baum purposefully concealed his longstanding relationships with Shift Studios, Spark Lighting, and at least one other potential investor from Plaintiffs, to realize his goals of illegally misappropriating intellectual property rightfully owned by GenusWave, and benefitting from the funds GenusWave transferred to Shift Studios and Spark Lighting as vendors while under the misconception that they had signed nondisclosure agreements.

84.     On information and belief, Nissenbaum was aware that Baum had defied his legal advice to secure nondisclosure agreements with all third parties prior to disclosing GenusWave's confidential and proprietary information, but did not alert Plaintiffs to this issue, and on information and belief, did nothing to remedy Baum's failure to secure nondisclosure agreements with Shift Studios and Spark Lighting.

85.     On July 14, 2021, Bogart sent Alevy, Baum, and Nissenbaum a presentation about a GenusWave UVC Technology-based product, called the Medical Lightbox. Each page was stamped "Private and Confidential" and featured GenusWave branding.

86.     Despite having the Medical Lightbox presentation ready, Baum asked Alevy's permission to postpone circulating the GenusWave-branded version to manufacturers, and to delay projected dates for prototype manufacturing by a full month. On information and belief, this was just a stall tactic so Baum could work with Shift Studios to strip the presentation of all GenusWave branding, a key step in his efforts to steal the UVC Technology and related products from GenusWave.

87.     Indeed, one week later, on July 22, 2021, Baum circulated a nearly identical version of the Medical Lightbox presentation, in which GenusWave's branding was replaced by branding

for Shift Studios, a third party with whom, on information and belief, Baum was affiliated. Because Baum was aware that Plaintiffs would see this version of the presentation, he falsely assured Plaintiffs that Shift Studios would "include Genus[W]ave markings . . . for review with manufacturers." But he provided no explanation for why he or Shift Studios would replace GenusWave's markings with Shift Studios' only to switch them back again.

88.     Ultimately, Baum's assurance was false. On information and belief, Baum disclosed the Medical Lightbox presentation to investors and manufacturers using Shift Studios branding, thereby misappropriating and misrepresenting ownership of the trade secrets contained therein.

89.     On information and belief, on July 23, 2021, Baum sent Alevy a video showing a demonstration of the UVC Technology-based device, wherein successful coupling of the fiber optic cable to the LED light provided for directing the majority of the light out of the distal end of the fiber optic cable—the project breakthrough that the Parties had been chasing from the collaboration's inception.

### III. Defendants Continue to Benefit from their Malfeasance

90.     On information and belief, Defendants agreed to exclude Plaintiffs from the UVC Technology collaborationas part of their plot to steal the intellectual property and trade secrets owned by Plaintiffs, and engaged in coordinated efforts to exclude Plaintiffs from receiving any benefits from the UVC Technology that had been developed.

91.     Defendants' plot to force out GenusWave culminated in a July 28, 2021 letter from Baum's attorney, Larry Loigman ("Loigman"), to Alevy, asserting GenusWave had no stake in the UVC Technology.

92.     The July 28 letter stated that it was in response to a July 26 email from Alevy to Nissenbaum, commemorating the events of the July 22 meeting. The fact that Baum's attorney

responded to an email that Alevy sent only to Nissenbaum is but one example of Defendants'
conspiracy to intentionally exclude Plaintiffs: for Loigman to have responded, Nissenbaum would
have needed to forward Alevy's email to Baum or his attorney. Notably, neither during the July
22 meeting when Nissenbaum attempted to alter the contract terms, nor in the six days in between
the meeting and the letter from Baum's attorney on July 28, did Nissenbaum ever deny the
existence of the Contract.

93.     The July 28 letter indicated only that Nissenbaum "has been associated with
[Alevy's] business in the past," and was devoid of any reference to GenusWave's contributions to
the UVC Technology.

94.     The July 28 letter further stated that Baum had advised his attorney "that there ha[d]
been some preliminary discussions between [Alevy] and Mr. Nissenbaum as to a proposed
investment." On information and belief, however, Defendants, including Baum, knew that
GenusWave had already invested in and was the 70% owner of the UVC Technology, as they had
repeatedly acknowledged this fact through their numerous requests for Plaintiffs' assistance in
funding, developing, and commercializing the UVC Technology.

95.     Through the July 28 letter, Baum's attorney also claimed that Alevy should not
"rely on anything which has occurred up until this point as reflecting Mr. Baum's assent to the
business relationship," without explaining why the assent of Baum—who was not a party to
Plaintiffs' Contract with Nissenbaum—was necessary, or why Baum was entitled to use
GenusWave's funding and resources related to the UVC Technology if he did not recognize the
existence of an agreement or "business relationship."

96.     Finally—and to Plaintiffs' shock—the July 28 letter stated that Defendants
continue to be "involved" in "the development of medical technology" relating to the UVC

Technology. In other words, Defendants continue to unlawfully benefit from Plaintiffs' contributions to and investment in the UVC Technology.

97.     On August 5, 2021, in response to Loigman's July 28, 2021 letter, Alevy sent an email to Loigman, Bogart, and Nissenbaum reaffirming his 70% interest in the UVC Technology.

98.     Also on August 5, 2021, Nissenbaum's attorney, Moskowitz, sent Alevy a letter disclaiming the existence of the Contract, despite the fact that Nissenbaum had discussed the Contract with Alevy just two weeks before during the July 22 meeting when Plaintiffs were pressured to take a reduced ownership in the UVC Technology.

99.     Realizing that Defendants had, on information and belief, conspired to deny Plaintiffs of GenusWave's rightful interest in the UVC Technology, on September 10, 2021, an attorney for Alevy sent Bogart, Loigman, and Moskowitz a cease and desist letter instructing Defendants to preserve relevant documents.

100.    Also on September 10, 2021, Alevy sent an email to Nissenbaum setting forth concerns over his exclusion from the UVC Technology project. Therein, Alevy asked Nissenbaum to provide "a copy of information from GenusWave's client file and a copy of any patent applications you have filed for the UVC light-based technology," as well as "[a]n accounting of the funds spent and that remain in your attorney trust account for the benefit of GenusWave."

101.    On November 1, 2021, Nissenbaum sent a letter to Alevy's attorney in which he formally withdrew from his representation on UVC Technology-related matters. Nissenbaum also attached a check for forty-one thousand dollars, apparently in an attempt to negate GenusWave's investment. Plaintiffs did not deposit the check.

102.    After Plaintiffs did not deposit the check, and in January of 2022, ostensibly in an effort to undercut GenusWave's claim to its ownership interest in the UVC Technology,

Nissenbaum—without notifying Plaintiffs—sent two wire transfers to Alevy totaling forty thousand nine hundred dollars.

103.    Despite severing ties with Plaintiffs, Baum and Bogart continue to retain items and other key materials owned by GenusWave. In mid-July 2021, Baum and Bogart directed a third-party fiber optic cable supplier to return LED assemblies, power supplies, and fiber optic cable assembly prototypes to Bogart in the name of GenusWave, and to use a FedEx account belonging to a GenusWave-related entity for shipping. On information and belief, Bogart retains these GenusWave-owned items.

104.    Moreover, on information and belief, Defendants retain GenusWave-owned plans, drawings, and designs.

105.    Finally, on information and belief, Defendants continue to use and disclose Plaintiffs' confidential information and trade secrets to further the UVC Technology without Plaintiffs' involvement.

106.    After over two years without communication, on May 12, 2024, Moskowitz emailed Plaintiffs' counsel offering to transfer Alevy twenty thousand five hundred dollars to be held in escrow as payment for what Moskowitz inaccurately characterized as Plaintiffs' loans for equipment and services. While Moskowitz characterized the funds as a loan, Plaintiffs declined to accept a return of these funds, and disagreed that the funds provided were a loan that could be paid off. The funds served as an equity investment in the UVC Technology in satisfaction of Plaintiffs' funding obligations under the Contract. On that basis, no instruction was given for the return of funds, and Moskowitz was advised that a response would be provided by retained counsel.

## COUNT I—BREACH OF CONTRACT
## (DEFENDANT ISRAEL NISSENBAUM)

107.  The allegations in the preceding paragraphs are incorporated by reference as if fully set forth herein.

108.  Plaintiffs and Nissenbaum entered into the Contract on or around June 17, 2020, with the following terms:

  a.  GenusWave would invest in the UVC Technology;

  b.  GenusWave would retain a 70% interest in intellectual property, including trade secrets, know-how, and competitively-sensitive information, developed to advance the UVC Technology, and in any entity formed for its development and commercialization;

  c.  Nissenbaum would retain a 30% interest in such intellectual property and entity; and

  d.  any ownership interest granted to Baum and/or Bogart would be allocated from Nissenbaum's ownership share.

109.  Plaintiffs performed under the Contract. Alevy caused GenusWave to invest over sixty thousand dollars in the UVC Technology between June 2020 and July 2021, and paid other expenditures to further develop the technology.

110.  Nissenbaum breached the Contract by attempting to dilute and refusing to honor GenusWave's ownership interest.

111.  Nissenbaum breached the Contract by conspiring with Baum and Bogart to deprive GenusWave of its rightful ownership interest in and profits from the UVC Technology, and any future venture relating thereto, despite his repeated acknowledgement of GenusWave's majority share and investment.

23

112.     Nissenbaum tried to avoid his contractual responsibilities to Plaintiffs by unilaterally attempting to refund Plaintiffs' investments, characterizing them as "loans"—despite the fact that this did not and does not absolve Nissenbaum of his obligations under the Contract.

113.     Nissenbaum may have breached the Contract in other ways which Plaintiffs have yet to discover.

114.     As a proximate result of Nissenbaum's breach of contract, Plaintiffs have been damaged in an amount to be proved at trial.

## COUNT II—TORTIOUS INTERFERENCE WITH CONTRACT
## (DEFENDANTS ASHER BAUM & MITCHELL BOGART)

115.     The allegations in the preceding paragraphs are incorporated by reference as if fully set forth herein.

116.     Defendants originally filed a provisional patent application for the treatment of viral, bacterial, and cancerous pathogens using UV light in April 2020. However, on information and belief, they realized they were unable to develop or commercialize the technology without additional funding and technical expertise.

117.     Accordingly, Nissenbaum introduced Baum and Bogart to Plaintiffs on June 10, 2020, and, on information and belief, all Parties knew that Plaintiffs' investment and expertise would advance the UVC Technology. Indeed, on information and belief, Baum and Bogart knew the preliminary idea of using UV light to treat viral, bacterial, and cancerous pathogens would be impossible to develop or commercialize without Plaintiffs' funding and Alevy's technical contributions.

118.     As a result of these deficiencies, on or around June 17, 2020, Plaintiffs and Nissenbaum entered into the Contract.

119.    Baum and Bogart repeatedly acknowledged the terms of the Contract, *i.e.*, GenusWave's ownership interest in the UVC Technology and its obligation to fund its development. Baum and Bogart also requested and accepted payment from Plaintiffs for expenditures related to the development of the UVC technology.

120.    Baum and Bogart used GenusWave titles and/or affiliations to represent to third parties that they were representatives of GenusWave, and upon information and belief never disputed third parties' understanding that GenusWave had an ownership interest in the UVC Technology.

121.    On information and belief, Baum and Bogart intentionally induced Nissenbaum to breach his contractual obligations or otherwise render his performance of the Contract impossible. In fact, on information and belief, Baum and Bogart intended from the Contract's inception to induce Nissenbaum's breach of the Contract.

122.    While exploiting Plaintiffs' relationships with industry experts, capitalizing on Alevy's connections with established manufacturers like Sanmina, causing patent applications relating to the UVC Technology to be filed without accreditation to Plaintiffs, and extracting over sixty thousand dollars from GenusWave to advance the UVC Technology, on information and belief, Baum and Bogart convinced Nissenbaum to breach the Contract by refusing to honor GenusWave's ownership interest.

123.    Loigman's letter makes clear that Baum was unhappy with the Contract between Plaintiffs and Nissenbaum. On information and belief, this is because Baum wanted to dilute GenusWave's shares in favor of Baum's preferred investors—including entities with which he was affiliated and from whose profits he would benefit—so that Baum could enrich himself from GenusWave's investment without providing any corresponding returns to GenusWave.

124.    On information and belief, Defendants continue to be involved in the development of the UVC Technology and intend to continue benefitting therefrom, revealing their incentive to deprive GenusWave of its rightful ownership share.

125.    As a proximate result of Baum's and Bogart's tortious interference with Plaintiffs' Contract with Nissenbaum, Plaintiffs have been damaged in an amount to be proved at trial.

## COUNT III—TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS (DEFENDANTS ASHER BAUM & MITCHELL BOGART)

126.    The allegations in the preceding paragraphs are incorporated by reference as if fully set forth herein.

127.    Plaintiffs' business relationship with Nissenbaum extends back to at least 2012, when Alevy engaged him as counsel.

128.    In May 2020, Nissenbaum approached Plaintiffs with the opportunity to invest in the UVC Technology, in which Nissenbaum and GenusWave would have an ownership stake.

129.    Through July 2021, Plaintiffs and Nissenbaum worked with Baum and Bogart to develop the UVC Technology, with the goal of commercializing a UVC Technology-based device in 2022.

130.    However, on information and belief, Baum and Bogart convinced Nissenbaum to disclaim both his attorney-client relationship and UVC Technology project-based business relationships with Plaintiffs. On information and belief, Baum and Bogart's objective was to cut Plaintiffs out of the UVC Technology project without sacrificing Nissenbaum's patent expertise.

131.    Baum and Bogart interfered through malicious and improper means, amounting to the independent torts of breach of fiduciary duty, fraudulent misrepresentation, negligent misrepresentation, unjust enrichment, conversion, state misappropriation of trade secrets, and unfair competition.

132.    As a proximate result of Baum's and Bogart's tortious interference with Plaintiffs' business relationship with Nissenbaum, Plaintiffs' business relationships with Nissenbaum have effectively been severed.

## COUNT IV—BREACH OF FIDUCIARY DUTY
## (DEFENDANTS ASHER BAUM & MITCHELL BOGART)

133.    The allegations in the preceding paragraphs are incorporated by reference as if fully set forth herein.

134.    Bogart served as GenusWave's CTO from November 2020 through approximately late July 2021, and thus owed fiduciary duties to GenusWave.

135.    On information and belief, and at an unknown time, Nissenbaum granted Baum part of his 30% ownership stake in the trade secrets, know-how, competitively-sensitive information, and/or other intellectual property related to the UVC Technology, and in any entity formed to commercialize the UVC Technology. Further, Plaintiffs relied on Baum as an employee, in his role as GenusWave's Project Manager for the UVC Technology, to maintain the confidentiality of GenusWave's proprietary and trade secret information, including by securing nondisclosure agreements with third-party vendors. Baum thus owed fiduciary duties to GenusWave.

136.    Baum disclosed confidential information about the UVC Technology to Shift Studios, Spark Lighting, and at least one other potential investor without first obtaining a nondisclosure agreement, tortiously interfered with Plaintiffs' Contract and business relationships with Nissenbaum, and misappropriated Plaintiffs' trade secrets, all in breach of his fiduciary duty to protect GenusWave's best interests.

137.    For example, on information and belief, Baum intentionally caused the Medical Lightbox presentation's GenusWave branding to be replaced by Shift Studios branding for

presentations to manufacturers, benefiting an entity with which Baum is affiliated at GenusWave's expense.

138.    Bogart tortiously interfered with Plaintiffs' Contract and business relationships with Nissenbaum and misappropriated Plaintiffs' trade secrets, in violation of his duty to protect GenusWave's best interests.

139.    On information and belief, Baum and Bogart improperly retain UVC Technology designs, drawings, materials, prototypes, and components purchased in the name of GenusWave.

140.    As a proximate result of Defendants' breach of their fiduciary duties, Plaintiffs have been damaged in an amount to be proved at trial.

### COUNT V—FRAUDULENT MISREPRESENTATION
### (ALL DEFENDANTS)

141.    The allegations in the preceding paragraphs are incorporated by reference as if fully set forth herein.

142.    Defendants repeatedly misrepresented that they assented to GenusWave's ownership in the UVC Technology. For example,

      a.      on November 22, 2020, Bogart emailed Alevy an overview of the medical applications of the UVC Technology and referred to the technology as a GenusWave product;

      b.      on January 14, 2021, Bogart emailed the Parties stating that, "following a successful product launch, GenusWave will be the sole manufacturer and distributor of its products, and the determiner of which subcontractors supply which key components";

      c.      on January 28, 2021, Baum wrote to the parties to inform them that an engineer wanted to pursue "our" high-powered LED lights;

d.    on January 31, 2021, Baum sent the Parties an email laying out various aspects of GenusWave's intellectual property, including UVC Technology-based products for use in medical treatments, disinfection, and HVAC systems;

e.    on February 22, 2021, Bogart submitted a statement of work on behalf of the GenusWave "Products Team";

f.    on April 9, 2021, Nissenbaum stated to the Parties that GenusWave's investment in the UVC Technology would be compromised if it did not have primary intellectual property rights, and sought to mollify Plaintiffs by telling them GenusWave's "investment [was] safe";

g.    on June 9, 2021, Baum provided a vendor with GenusWave's information for use in a nondisclosure agreement, explaining that Alevy is the Principal of GenusWave; and

h.    on July 22, 2021, Baum sent the Shift Studios-branded version of the Medical Lightbox presentation to Alevy, Bogart, and Nissenbaum, stating that Shift Studios would revise it to "include Genuswave marking . . . for review with manufacturers."

143.    All of these statements were false. On information and belief, at the time these statements were made, Defendants had already decided to deprive Plaintiffs of GenusWave's ownership stake in the UVC Technology. The statements were made with the intent to extract further funds and labor from Plaintiffs on the false promise of returns on GenusWave's investments.

144. Further, on information and belief, Baum had longstanding relationships with Shift Studios, Spark Lighting, and at least one other potential investor. On information and belief, these relationships predate the UVC Technology venture, and during the time period relevant to the allegations in this Complaint, Baum intended to extract value from Plaintiffs to benefit himself and these entities. Therefore, all of his statements and omissions relating to Plaintiffs' ownership of and involvement in the UVC Technology were false.

145. For example, on July 4, 2021, Baum sent Alevy, Bogart, and Nissenbaum an email discussing objectives through September 2021, with the goal of launching "a disinfection product by March–May 2022." Just ten days later, on July 14, Baum asked to push back the start and end dates for prototype manufacturing by a full month. He explained that he intended for the contract manufacturer to provide all of the Parties with thirty devices to "thoroughly test before market entry" in May 2022.

146. But these statements were false; on information and belief, Baum never intended to launch a disinfection product with Plaintiffs, as he stated, nor did he intend for Plaintiffs to receive any devices to test prior to market entry.

147. Indeed, the very next day, July 15, Baum and Bogart directed a GenusWave vendor to return LED assemblies and power supplies used for testing, along with fiber optic cable assembly prototypes that the vendor was paid to provide, to Bogart in the name of GenusWave. On information and belief, Bogart retains these GenusWave-owned items.

148. And, on July 22, Baum circulated a version of the Medical Lightbox presentation that replaced GenusWave's branding with Shift Studio's, falsely assuring GenusWave that Shift Studio would "include Genuswave markings on deck for review with manufacturers." On

information and belief, however, Baum disclosed the Shift Studios-branded version of this presentation, and Plaintiffs' trade secrets contained therein, to third parties.

149. Bogart regularly communicated directly with GenusWave about furthering the UVC Technology through mid-July 2021, including seeking reimbursement for UVC Technology-related expenses.

150. Finally, GenusWave advanced Nissenbaum thirty-six thousand dollars for what Nissenbaum claimed were UVC Technology-related expenditures on June 29, 2021. Yet less than one month later, on July 22, Nissenbaum informed Alevy that GenusWave's ownership stake would need to be reduced to accommodate another investor, then ceased communicating with GenusWave, except through attorneys.

151. Plaintiffs reasonably relied on Defendants' repeated and unambiguous misrepresentations relating to GenusWave's ownership interest to continue contributing to the UVC Technology venture.

152. Plaintiffs reasonably believed that their Contract with Nissenbaum would protect their investments and GenusWave's ownership stake in the UVC Technology.

153. As a proximate result of Defendants' fraudulent misrepresentations and omissions, Plaintiffs have been damaged in an amount to be proved at trial.

## COUNT VI—NEGLIGENT MISREPRESENTATION
## (ALL DEFENDANTS)

154. The allegations in the preceding paragraphs are incorporated by reference as if fully set forth herein.

155. Nissenbaum was GenusWave's counterparty to the Contract.

156. As GenusWave's CTO, Bogart was GenusWave's fiduciary.

157.    As an employee of GenusWave, Baum was GenusWave's fiduciary. He also had a special relationship imposing fiduciary duties to GenusWave, and at the very least, had a confidential relationship with GenusWave.

158.    Additionally, all Defendants participated in the UVC Technology venture with Plaintiffs, creating an independent privity-like relationship.

159.    As alleged above, Defendants provided Plaintiffs with incorrect information about their assent to GenusWave's ownership interest in the UVC Technology.

160.    Baum specifically stated that the Shift Studios-branded Medical Lightbox presentation would be reformatted to include GenusWave branding, which on information and belief did not occur.

161.    As alleged above, Plaintiffs reasonably relied on Defendants' repeated and unambiguous misrepresentations relating to GenusWave's ownership interest, and contributed to the UVC Technology venture based on that reliance.

162.    Plaintiffs reasonably believed that their Contract with Nissenbaum would protect their investments and GenusWave's ownership stake in the UVC Technology.

163.    As a proximate result of Defendants' negligent misrepresentations and omissions, Plaintiffs have been damaged in an amount to be proved at trial.

### COUNT VII—UNJUST ENRICHMENT
### (ALL DEFENDANTS)

164.    The allegations in the preceding paragraphs are incorporated by reference as if fully set forth herein.

165.    GenusWave advanced Nissenbaum thirty-six thousand dollars for various expenditures.

166.   GenusWave paid Shift Studios at least $8,150, and Spark Lighting at least $3,734 to further the UVC Technology venture. On information and belief, Baum benefitted from these outlays to Shift Studios and Spark Lighting, such that he was unjustly enriched at Plaintiffs' expense.

167.   GenusWave purchased designs, drawings, and materials relating to the UVC Technology, and commissioned additional materials from third parties. On information and belief, Baum and Bogart retain all of these GenusWave-owned items.

168.   Nissenbaum, in breach of his Contract with GenusWave, exploited his position within the UVC venture to extract tens of thousands of dollars from GenusWave.

169.   Baum concealed his relationships with Shift Studios and Spark Lighting, on information and belief for the express purpose of enriching himself at GenusWave's expense.

170.   Unbeknownst to Plaintiffs, Baum also failed to secure nondisclosure agreements with Shift Studios, Spark Lighting, and at least one other potential investor.

171.   On information and belief, Nissenbaum was aware of this failure, yet did not inform Plaintiffs.

172.   Defendants repeatedly extracted funds from GenusWave by unequivocally representing that the UVC Technology belonged to GenusWave; including Plaintiffs on UVC Technology-related emails and meetings; and consulting Plaintiffs regarding critical manufacturing, commercialization, and other business decisions.

173.   Nissenbaum was GenusWave's counterparty to the Contract.

174.   As GenusWave's CTO, Bogart was GenusWave's fiduciary.

175. As an employee of GenusWave, Baum was GenusWave's fiduciary. He also had a special relationship imposing fiduciary duties to GenusWave, and at the very least, had a confidential relationship with GenusWave.

176. Additionally, all Defendants participated in the UVC Technology venture with Plaintiffs, creating an independent privity-like relationship.

## COUNT VIII—CONVERSION
## (DEFENDANTS ASHER BAUM & MITCHELL BOGART)

177. The allegations in the preceding paragraphs are incorporated by reference as if fully set forth herein.

178. As alleged above, Baum and Bogart repeatedly acknowledged GenusWave's ownership rights in the UVC Technology.

179. On information and belief, Baum and Bogart currently possess UVC Technology designs, drawings, and materials purchased in the name of GenusWave, to the exclusion of GenusWave.

180. Baum and Bogart's refusal to return these materials upon GenusWave's demand constitutes conversion.

## COUNT IX—MISAPPROPRIATION OF TRADE SECRETS
## UNDER 18 U.S.C. §§ 1831 *et seq.*
## (ALL DEFENDANTS)

181. The allegations in the preceding paragraphs are incorporated by reference as if fully set forth herein.

182. During the course of the Parties' collaboration, GenusWave developed a variety of trade secrets related to the UVC Technology, which included, without limitation, the use of a TIR lens to collimate UVC light prior to its transmission through a fiber optic cable, and commercialization strategies. The commercialization strategies included information relating to

manufacturing plans, processes, and supply chains developed, in part, through continuing discussions with vendors, manufacturers, and experts in the medical device industry that were needed to develop the UVC Technology into a final product. Those strategies also included determining additional applications for the UVC Technology, and how the UVC Technology could be designed and developed in a way that it would allow it to be able to employed for a broader range of applications, including but not limited to sanitization of medical equipment.

183.    As alleged above, Defendants repeatedly and unambiguously referred to the UVC Technology as belonging to GenusWave.

184.    GenusWave took at least two reasonable measures to maintain the confidentiality of its trade secrets. First, it executed nondisclosure agreements before disclosing any essential information about the UVC Technology (except in the case of Shift Studios, Spark Lighting, and a potential strategic investor, due to Defendants' fraudulent concealment). Second, GenusWave materials, including the GenusWave-branded Medical Lightbox presentation, were marked as "Confidential" on each page.

185.    Plaintiffs instructed and relied on their attorney, Nissenbaum to ensure that nondisclosure agreements were executed prior to the disclosure of any GenusWave confidential, proprietary, and trade secret information.

186.    The UVC Technology is economically valuable; indeed, on information and belief, Defendants plan to profit from commercializing UVC Technology-based products using Plaintiffs' trade secrets.

187.    Defendants acquired GenusWave's trade secrets on false pretenses.

188. Plaintiffs disclosed their trade secrets to Nissenbaum as their attorney and pursuant to the Contract, which provided both GenusWave and Nissenbaum with ownership stakes in the UVC Technology. Such disclosure was necessary in order to realize returns on Plaintiffs' interests.

189. Plaintiffs disclosed their trade secrets to Baum and Bogart in their capacities as fiduciaries or, at the very least, in the context of their confidential and privity-like relationships.

190. On information and belief, however, Nissenbaum breached the Contract, and all Defendants breached their fiduciary duties and/or duties of confidentiality to Plaintiffs by disclosing Plaintiffs' trade secrets to third parties, including Shift Studios, Spark Lighting, and at least one other potential investor, without securing nondisclosure agreements beforehand.

191. Nissenbaum never informed Plaintiffs that Defendants had so disclosed Plaintiffs' trade secrets.

192. As alleged above, Baum and Bogart also induced Nissenbaum to breach his Contract with GenusWave in order to use or disclose the trade secrets.

193. Finally, on information and belief, Defendants continue to use and disclose Plaintiffs' trade secrets while denying Plaintiffs any rightful revenue therefrom, compounding Plaintiffs' irreparable harm.

### COUNT X—MISAPPROPRIATION OF TRADE SECRETS UNDER NEW YORK COMMON LAW (ALL DEFENDANTS)

194. The allegations in the preceding paragraphs are incorporated by reference as if fully set forth herein.

195. During the course of the Parties' collaboration, GenusWave developed a variety of trade secrets related to the UVC Technology, which included, without limitation, the use of a TIR lens to collimate UVC light prior to its transmission through a fiber optic cable and commercialization strategies. The commercialization strategies included information relating to

manufacturing plans, processes and supply chains developed, in part, through continuing discussions with vendors, manufacturers, and experts in the medical device industry that were needed to develop the UVC Technology into a final product. Those strategies also included determining additional applications that would be commercially viable for the UVC Technology, and how the UVC Technology could be designed and developed in a way that it would allow it to be able to employed for a broader range of applications, including but not limited to sanitization of medical equipment.

196.   As alleged above, Defendants repeatedly and unambiguously referred to the UVC Technology as belonging to GenusWave.

197.   GenusWave took at least two reasonable measures to maintain the confidentiality of its trade secrets. First, it executed nondisclosure agreements before disclosing any essential information about the UVC Technology (except in the case of Shift Studios, Spark Lighting, and a potential strategic investor, due to Defendants' fraudulent concealment). Second, GenusWave materials, including the GenusWave-branded Medical Lightbox presentation, were marked as "Confidential" on each page.

198.   Plaintiffs instructed and relied on their attorney, Nissenbaum to ensure that nondisclosure agreements were executed prior to the disclosure of any GenusWave confidential, proprietary, and trade secret information.

199.   The UVC Technology is economically valuable; indeed, on information and belief, Defendants plan to profit from commercializing UVC Technology-based products using Plaintiffs' trade secrets.

200.   Defendants acquired GenusWave's trade secrets on false pretenses.

201.    Plaintiffs disclosed their trade secrets to Nissenbaum as their attorney and pursuant to the Contract, which provided both GenusWave and Nissenbaum with ownership stakes in the UVC Technology. Such disclosure was necessary in order to realize returns on Plaintiffs' interests.

202.    Plaintiffs disclosed their trade secrets to Baum and Bogart in their capacities as fiduciaries or, at the very least, in the context of their confidential and privity-like relationships.

203.    On information and belief, however, Nissenbaum breached the Contract, and all Defendants breached their fiduciary duties and/or duties of confidentiality to Plaintiffs by disclosing Plaintiffs' trade secrets to third parties, including Shift Studios, Spark Lighting, and at least one other potential investor, without securing nondisclosure agreements beforehand.

204.    Nissenbaum never informed Plaintiffs that Defendants had so disclosed Plaintiffs' trade secrets.

205.    As alleged above, Baum and Bogart also induced Nissenbaum to breach his Contract with GenusWave in order to use or disclose the trade secrets.

206.    Finally, on information and belief, Defendants continue to use and disclose Plaintiffs' trade secrets while denying Plaintiffs any rightful revenue therefrom, compounding Plaintiffs' irreparable harm.

## COUNT XI—UNFAIR COMPETITION
## (ALL DEFENDANTS)

207.    The allegations in the preceding paragraphs are incorporated by reference as if fully set forth herein.

208.    As alleged in Counts IX and X, Defendants misappropriated Plaintiffs' trade secrets.

209.    GenusWave contributed over sixty thousand dollars to develop the UVC Technology, including advancing tens of thousands of dollars to Nissenbaum, and reimbursing all

Defendants for various expenditures. Defendants accepted these funds without revealing their intent to cut Plaintiffs out of the venture.

210.     Plaintiffs participated in internal and external meetings relating to the UVC Technology; leveraged Alevy's longstanding relationships with investment bankers to set up calls with experts familiar with medical equipment and device manufacturers; conceived of the use of the UVC Technology to sanitize endoscopes in addition to intrabody medical applications, resulting in patent applications directed to such uses; and facilitated discussions with Defendants and other third parties to overcome technical problems and engineering issues. Indeed, on May 6, 2021, Baum emailed Alevy, copying Nissenbaum and the Bogarts, asking how GenusWave would position itself during an upcoming presentation to a third party, telling Alevy that "[w]e'll follow your lead!"

211.     As alleged above, Defendants repeatedly assured Plaintiffs of their assent to GenusWave's ownership interest in the UVC Technology by representing that GenusWave owned the UVC Technology and engaging GenusWave in discussions related to the UVC Technology.

212.     Nissenbaum, in particular, assured Alevy in April 2021 that his "investment" was "safe."

213.     Defendants obtained information relating to the UVC Technology by exploiting and breaching their contractual, fiduciary and/or confidential relationships with GenusWave.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.     That Defendants be preliminarily and permanently enjoined from (a) retaining, copying, sharing, disclosing, evaluating, analyzing, or using in any way any trade secrets or confidential information of Plaintiffs, and (b) any improper benefit from the misappropriated information to prevent irreparable harm, including an injunction barring Defendants from

commercially releasing any product or offering or providing any services intended to commercialize the UVC Technology;

2.      That judgment be granted in Plaintiffs' favor, against Defendants, on all claims herein;

3.      That the Court impose a constructive trust over all wrongfully acquired property and resulting profits;

4.      That Plaintiffs have and recover from Defendants actual and compensatory damages in an amount in excess of $75,000, to be proven at trial;

5.      That Plaintiffs recover exemplary damages pursuant to all applicable law, including 18 U.S.C. § 1836(b)(3)(C);

6.      That Plaintiffs recover attorneys' fees pursuant to all applicable law;

7.      That Plaintiffs recover pre- and post-judgment interest at the legal rate;

8.      That Plaintiffs be awarded costs and expenses of this action to the extent permitted by law;

9.      That the Court conduct a jury trial on triable issues; and

10.     That the Court award such other additional relief as it deems just and proper.

Dated: August 5, 2024            Ballard Spahr LLP

                                   By:   */s/ Celia Cohen*
                                      Celia Cohen

                                   Celia Cohen
                                   Kenneth Sonnenfeld
                                   BALLARD SPAHR LLP
                                   1675 Broadway, 19th Floor
                                   New York, NY 10019
                                   Telephone: 212.223.0200
                                   Facsimile: 212.223.1942
                                   cohenc@ballardspahr.com
                                   sonnenfeldk@ballardspahr.com

Heath Khan
(motion for admission *pro hac vice* forthcoming)
Haesun Burris-Lee
(motion for admission *pro hac vice* forthcoming)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: 215.665.8500
Facsimile: 215.864.8999
khanh@ballardspahr.com
burrisleeh@ballardspahr.com

Alan White
(motion for admission *pro hac vice* forthcoming)
BALLARD SPAHR LLP
999 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Telephone: 678.420.9300
Facsimile: 678.420.9301
whiteda@ballardspahr.com

*Attorneys for GenusWave Limited and Steven Alevy*